### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

R.L., a minor, by and through his    :
parents, MICHAEL LORDAN and    :
JILL LORDAN, Husband and Wife,    :
       Plaintiffs,    :
                           :       1:14-cv-00450
         v.    :
                           :       Hon. John E. Jones III
CENTRAL YORK SCHOOL    :
DISTRICT; JEFFREY HAMME,    :
Assistant Principal, Central York    :
High School, and MICHAEL    :
SNELL, District Superintendent    :
       Defendants.    :

### <u>MEMORANDUM</u>

### May 3, 2016

Presently pending before the Court are Plaintiffs' and Defendants' motions for summary judgment. For the reasons that follow, we shall grant in part and deny in part Plaintiffs' motion, and grant in part and deny in part Defendants' motion.

## I. PROCEDURAL HISTORY

Our recitation of the procedural history of the instant matter is abbreviated, as it is recounted solely for the benefit of the parties, who are familiar with the matter.

R.L., a minor, by and through his parents, Michael Lordan and Jill Lordan, commenced this action by filing a Complaint on March 11, 2014, alleging claims

under 42 U.S.C. § 1983 for violations of his First Amendment free speech rights and Fourteenth Amendment due process rights. (Doc. 1). The Complaint also includes a state law claim for violation of R.L.'s free speech rights under the Pennsylvania Code.

On May 12, 2014, Defendants filed a motion to dismiss, requesting dismissal of all counts of Plaintiffs' Complaint for failure to state a claim for which relief can be granted. (Doc. 14). On October 15, 2014, the Court granted in part and denied in part Defendants' motion to dismiss. We dismissed the claims against Defendant Jeffrey Hamme, but gave leave to amend. We dismissed, without leave to amend, the claims against Defendants Hamme and Michael Snell in their official capacities. The motion was denied in all other respects. We gave leave to Plaintiffs to file an amended complaint consistent with our Opinion, but they chose to not do so within the permitted time frame.

On September 1, 2015, Plaintiffs and Defendants each filed a motion for summary judgment. (Docs. 49, 54). The motions have been fully briefed and statements of undisputed material facts have been filed and responded to. (Docs. 50, 52, 55, 61, 62, 66). Therefore, the motions are ripe for our review.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a fact is "material" only if it might affect the outcome of the action under the governing law. *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 172 (3d Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court should view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences therefrom, and should not evaluate credibility or weigh the evidence. *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

Initially, the moving party bears the burden of demonstrating the absence of a genuine dispute of material fact, and upon satisfaction of that burden, the non-movant must go beyond the pleadings, pointing to particular facts that evidence a genuine dispute for trial. *See id.* at 773 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). In advancing their positions, the parties must support their factual assertions by citing to specific parts of the record or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1).

A court should not grant summary judgment when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them. *See Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010) (citing *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982)). Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 211 (3d Cir. 2011) (quoting *Anderson*, 477 U.S. at 247-48) (internal quotation marks omitted).

## III.   FACTUAL SUMMARY

The following facts are undisputed by the parties: At the time of the incident at the center of this action, R.L. was a 15-year-old student in the ninth grade at Central York High School, ("the High School"), located in the Defendant Central York School District, ("the School District"). Defendant Michael Snell was at all relevant times the Superintendent of the School District. There are approximately 1,700 students and 200 staff members at the High School. (Doc. 52, ¶ 17).

On October 23, 2013, administrators at the High School received a bomb threat. (*Id.*, ¶ 2). Specifically, a student had reported at 8:30 a.m. that morning that he had found a note which read, "there is a bomb in the school."[1] (*Id.*, ¶ 18). The High School administration immediately began investigating the threat and notified

---

[1] To be clear, it is undisputed by the parties that this initial morning note qualified as a bomb threat.

the Springettsbury Township Police of the threat, as well. (*Id.*, ¶ 20).

Approximately twenty (20) police officers responded to the bomb threat that day.

(*Id.*, ¶ 21).

Students and staff of the High School were evacuated from the school

building to the regular fire drill locations at approximately 9:15 a.m.; these fire

drill locations were intended to be temporary as school administrators were sent to

the school stadium to search it and determine whether it was safe for everyone to

be moved there. (*Id.*, ¶¶ 23-24). Additionally, the School District notified the

school community and parents about the bomb threat and evacuation. (*Id.*, ¶ 25).

Gas lines at the school were disconnected as a precaution. (*Id.*, ¶ 26).

The students were ultimately moved to the baseball field, a decision made by

Superintendent Snell. (*Id.*, ¶ 33). This change of procedure was due to the fact that

another student had posted on the social networking website Twitter, in the form of

a "tweet," that "the bomb is supposedly in the stadium."[2] (*Id.*, ¶¶ 32-33). The State

Police Canine Unit arrived at 10:30 a.m.; based on the amount of time required for

a complete and thorough search of the school, Superintendent Snell decided to

cancel school for the day. (*Id.*, ¶ 34). The students, including R.L., were dismissed

and sent home at approximately 11:30 a.m. (*Id.*, ¶ 2).

---

[2] Plaintiffs deny this "tweet" as immaterial hearsay. However, we do not find this evidence to qualify as hearsay. It is not being offered for truth of the matter asserted—that there was a bomb in the stadium—but instead to explain Defendant Snell's reaction and decision to move the students to the baseball field instead of the stadium. Regardless, the evidence of this tweet is not particularly material to our disposition of the pending motions.

The police did not find a bomb during their search, and concluded their search of the school building around 1:30 p.m. (*Id.*, ¶ 38).

After he was dismissed, while away from school property and using a personal computer, R.L. published a post on his Facebook page around 11:30 a.m. which read: "Plot twist, bomb isn't found and goes off tomorrow." (*Id.*, ¶¶ 3, 39). After the morning note and the tweet, R.L.'s post was the third separate message referring to a bomb on October 23, 2013. (*Id.*, 42).

During the afternoon of that same date, October 23, the Springettsbury Township Police notified the School District administration of R.L.'s Facebook post. (*Id.*, ¶ 4). Superintendent Snell testified in his deposition that he had multiple conversations with Principal Ryan Caufman and other school administrators about what they needed to do to "maintain safety and security." (Doc. 52, Snell Dep., pp. 40-41). Superintendent Snell involved multiple other school administrators about the situation with R.L., although Plaintiffs dispute the extent to which his conversations with these other administrators can be characterized as involving them in the "investigation" of R.L. (*Id.*, p. 46; Doc. 62, ¶ 44). In describing his response to the Facebook post and his initial conversations with other school administrators, Superintendent Snell testified that they

> basically launch[ed] into the very thing we did at the first phone call in the morning. We launched into the very same thing that we did when we had the tweet. And again, all for safety and security. What is this continual bomb threat that continues to have—and that's in my

> opinion, it was a continuation of messaging, whether it was a note, a
> tweet or a post regarding a bomb in our school.

(*Id.*, p. 39). Superintendent Snell also discussed with Principal Caufman whether to

bring the police dogs back to the school. They ultimately decided not to bring the

dogs back. (*Id.*, pp. 40-42). Superintendent Snell was also frustrated that local law

enforcement was not able to interview R.L. immediately. He wanted someone to

go have a conversation with R.L. (*Id.*, pp. 42-43).

At approximately 3:15 p.m., R.L. returned to the High School to gather

personal items from one of his classrooms, as well as his personal mobile device.

Once he had retrieved his mobile device, R.L. deleted the aforementioned post

from his Facebook page. (Doc. 52, ¶¶ 5-6).

The High School administration contacted R.L.'s father, Plaintiff Michael

Lordan, to discuss R.L.'s Facebook post, from whom they learned that R.L. was in

route to a football game at Red Lion High School. (*Id.*, ¶ 7). Superintendent Snell

traveled to the game and met with both Mr. Lordan and R.L. at approximately 8:00

p.m.. (*Id.*, ¶ 52). Superintendent Snell questioned R.L. about his intentions and

capabilities with regard to bomb-making. (*Id.*, ¶ 54; Snell Dep., p. 50). R.L.

admitted to authoring the post and agreed, in retrospect, that the post had been ill-

advised under the circumstances. (Doc. 52, ¶ 8). At the end of this conversation,

Superintendent Snell told R.L. and Mr. Lordan that R.L. would be suspended from

school for 10 days. (*Id.*, ¶ 9).

On October 24, 2013, Mr. Lordan and his wife, Plaintiff Jill Lordan, received notice, via email, that R.L. had been suspended for 10 days as a result of a "terroristic or bomb threat." (*Id.*, ¶ 10). Then, on October 25, 2013, the School District issued a notice to the Plaintiffs indicating that R.L. was suspended pending a Superintendent or Board Level Hearing, and that "[t]he incident, which prompted this suspension, included [R.L.] engaging in behavior that caused a disruption to the school environment." (*Id.*, ¶ 11). That notice also cited the High School Handbook's prohibition on "[behavior] or items brought to school that are inappropriate, that may cause a disruption to the school environment." (*Id.*, ¶ 12).

On October 28, 2013, Mr. Lordan received an email from the High School's Assistant Principal, Jeffrey Hamme, who wrote, "As per your request, Mr. Caufman has asked me to email you the change in terminology for the behavior that was originally listed on the referral form for [R.L.]. The new terminology reads as follows: 'Behavior or items brought to school that are inappropriate, that may cause a disruption to the school environment." (*Id.*, ¶ 13).

On October 29, 2013, Mr. and Mrs. Lordan received a letter from Superintendent Snell indicating that R.L. was alleged to have violated the Student Code of Conduct provision involving "behavior or items brought to school that are inappropriate, that may cause a disruption to the school environment," and stating that R.L.'s conduct could lead to suspension or expulsion. (*Id.*, ¶ 14).

The School District held a discipline hearing on November 6, 2013, after which the District expelled R.L. for an additional thirteen (13) days to follow the initial 10-day suspension. (*Id.*, ¶ 15).

The parties dispute the extent to which R.L.'s Facebook post caused an actual disruption at the School. In his deposition, Superintendent Snell testified that the following school day, October 24, did not proceed as a normal or usual school day, in that at least three students came to see administrators worried about the Facebook post. (*Id.*, p. 70). Plaintiffs dispute this, pointing to Defendants' responses to Plaintiffs' interrogatories in which Defendants reported that a number of students and parents expressed concerned about the bomb threat(s) that day, but that Defendants were unable to determine whether their concern was directly attributable to the Facebook post or to the morning bomb threat, or to "the combined effect of both threats." (Doc. 55, Ex. B, Resp. to Interrogatory No. 11).

The parties do not dispute that Principal Caufman reported having met with three students on October 24. (*Id.*, ¶ 60). In his affidavit, Principal Caufman averred that the students indicated they had seen R.L.'s Facebook post and were concerned about being in school, that their parents had been reluctant to send them to school, and that they were nervous there was still a potential threat. (Doc. 52, Ex. 3, ¶¶ 3-4). Plaintiffs dispute these reported statements of the students as inadmissible hearsay, to the extent the statements are offered to show the students

were nervous about R.L.'s post. Principal Caufman also averred that he received

four (4) or (5) phone calls from parents who were concerned and wanted to know

what was being done to secure their children's safety; Plaintiffs also dispute this

asserted fact as hearsay and also as irrelevant and speculative, given that Principal

Caufman admits in his affidavit that it is unclear whether these calls were related to

the original morning bomb threat or R.L.s Facebook post. (Doc. 62, ¶ 63; Caufman

Aff., ¶ 6).

Other school administrators reported receiving additional phone calls similar

to the ones detailed above on October 24, and Plaintiffs object to this evidence as

hearsay and speculative, as well. (Docs. 52, 62, ¶¶ 64-66).

## IV.   DISCUSSION

At the outset, we note that our ability to decide with confidence whether

R.L.'s speech was protected by the First Amendment is hamstrung by the

perplexing state of relevant precedent. The extent to which schools can discipline

or punish students for speech has been a developing area of law for the past few

decades; with each precedential decision, lower courts are left with as many

questions as they have answers.

Thus, we will begin our analysis with a survey of Supreme Court and Third

Circuit precedent bearing on student speech and the extent to which schools have

been permitted—or not permitted—to regulate it. Then, we will apply this

precedent to the facts of the instant case.

### A.   First Amendment Claim

### 1.   Overview of Supreme Court and Third Circuit Precedent

In *Tinker v. Des Moines Independent Community School District*, the United

States Supreme Court famously wrote that its precedent has been clear that neither

teachers nor students "shed their constitutional rights to freedom of speech or

expression at the schoolhouse gate." 393 U.S. 503, 506 (1969). At the same time,

case law is equally clear that the specific context of the school environment affects

and in some situations limits the exercise of First Amendment rights by students, in

ways that an adult's speech in another setting would not be. *Bethel Sch. Dist. No.*

*403 v. Fraser*, 478 U.S. 675, 682 (1986). The Supreme Court "has repeatedly

emphasized the need for affirming the comprehensive authority of the States and of

school officials, consistent with fundamental constitutional safeguards, to prescribe

and control conduct in the schools." *Tinker*, 393 U.S. at 507 (internal citations

omitted). As noted by the Third Circuit in one of its recent cases, "Since *Tinker*,

courts have struggled to strike a balance between safeguarding students' First

Amendment rights and protecting the authority of school administrators to

maintain an appropriate learning environment." *J.S. ex rel. Snyder v. Blue*

*Mountain Sch. Dist.*, 650 F.3d 915, 926 (2011).

In *Tinker*, the Supreme Court provided lower courts with the basic
framework for analyzing student free speech claims. There, the Court held that "to
justify prohibition of a particular expression of opinion, [school officials] must be
able to show that its action was caused by something more than a mere desire to
avoid the discomfort and unpleasantness that always accompany an unpopular
viewpoint." *Id.* at 509. Instead, "school officials must demonstrate that 'the
forbidden conduct would materially and substantially interfere with the
requirements of appropriate discipline in the operation of the school.'" *Snyder*, 650
F.3d at 926 (quoting *Tinker*, 393 U.S. at 509) (quotation marks omitted). Further,
"*Tinker* requires a specific and significant fear of disruption, not just some remote
apprehension of disturbance." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200,
211 (3d Cir. 2001).

It is worth noting that although *Tinker* has been the accepted standard for
assessing student free speech claims in a variety of cases, that case specifically
concerned political speech by students. There, school administrators had
promulgated a regulation prohibiting the wearing of black armbands by students at
school. Students wore these armbands in protest of the Vietnam conflict. After
announcing the aforementioned analytical framework, the Court found that the
record in the case "d[id] not demonstrate any facts which might reasonably have
led school authorities to forecast substantial disruption of or material interference

with school activities, and no disturbances or disorders on the school premises in fact occurred." *Tinker*, 393 U.S. at 514. Thus, the Court held that the school's regulation was an unconstitutional denial of the students' free speech rights.

The fractured nature of the Third Circuit's decision in *Snyder*, and the questions left open by that case, underscore just how much the courts have struggled with striking this balance between protecting student free speech and respecting the authority and discretion of school administrators to supervise the school environment since *Tinker*. There, the student, J.S., had been suspended by her school district for creating, on her home computer, a MySpace profile making fun of her middle school principal, using crude and vulgar language. The profile contained insults and very personal attacks against the principal and his family. *Snyder*, 650 F.3d at 920-921.

The Circuit panel that initially heard the appeal in *Snyder* affirmed the district court's grant of summary judgment to the defendant school district. However, after a rehearing en banc, the Third Circuit vacated its prior opinion and affirmed in part and reversed in part the district court's grant of summary judgment. The court ultimately held that "[b]ecause J.S. was suspended from school for speech that indisputably caused no substantial disruption in school and that could not reasonably had led school officials to forecast substantial disruption at school," the defendant school district had violated J.S.'s First Amendment free

speech rights. *Id.* at 920. The *Snyder* majority arrived at this holding by comparing the facts of the case before them with the facts in *Tinker*, and concluded that if the Supreme Court in *Tinker* found that the school officials could not have reasonably forecast disruption there, where the students' armbands were an "ostentatious reminder of the highly emotional and controversial subject of the Vietnam war," then the majority did not find the facts in *Snyder* to support a reasonable forecast of disruption, either. *Id.* at 928-930. The majority in *Snyder* also responded to the school district's argument that the MySpace profile was sanctionable because it aroused suspicion that the principal engaged in sexual misconduct by reasoning that the profile was "so outrageous that no one could have taken it seriously, and no one did." *Id.* at 930. The *Snyder* majority further distinguished the cases cited by the school district by finding that J.S. did not intend for the speech to reach the school insofar as she took steps to make the MySpace profile "private," thus only permitting her friends to access it, even though the majority acknowledged that her MySpace friends were generally other students at the middle school. *Id.* at 930.

However, in reaching its holding in *Snyder*, the Third Circuit assumed, without deciding, that *Tinker* applied to the student's speech in that case. *Id.* at 926. This is because the Third Circuit evidently was not yet ready to conclude whether *Tinker* applies to off-campus student speech. *Id.* at 926 n. 23. Judge Smith, in a concurring opinion in which four other judges joined, wrote that he would

have held that *Tinker* does *not* apply to off-campus speech, and that "the First Amendment protects students engaging in off-campus speech to the same extent it protects speech by citizens in the community at large." *Id.* at 936 (Smith, J., concurring). Judge Fisher, in a dissent in which five other judges joined, disagreed with Judge Smith's desired rule, and instead wrote, "While I agree with the majority's apparent adoption of the rule that off-campus student speech can rise to the level of a substantial disruption, I disagree with the Court's application of that rule to the facts of this case." *Id.* at 941 (Fisher, J., dissenting). Judge Fisher argued that it was permissible on the facts of the case for the school district to discipline the student because substantial disruption was in fact reasonably foreseeable. He further noted that while the majority rested its holding in part on a mischaracterization of the relevant facts—namely, their finding that the MySpace profile was intended as a joke and should not have been taken seriously—and that regardless, "the intent of the speaker is of no consequence" to the test outlined in *Tinker*. *Id.* at 948.

In another en banc decision in a student speech case issued on the same day as *Snyder*, *Layshock ex rel. Layshock v. Hermitage School District*, 650 F.3d 205 (3d Cir. 2011), the Third Circuit again failed to resolve the question of whether *Tinker* "can be applicable to off-campus speech." 650 F.3d at 220 (Jordan, J., concurring). Regardless, the Third Circuit again held that the school district had

violated the student in question's First Amendment right of expression by disciplining him for his speech, which also occurred off-campus. In that case, the student, Justin Layshock, used a computer at his grandmother's house during non-school hours to create a "parody profile" on MySpace of his high school principal. *Id.* at 207. His parody profile, similar to the one created by the student in *Snyder*, described his principal in vulgar and crude ways, as well; for example, the profile stated that the principal was a "big steroid freak," that he had been drunk many times, and that he was a "big whore" and a "big fag." *Id.* at 208.  Because Justin allowed other students in the school district to be "friends" on the MySpace website, they were able to access and view the profile; consequently, news of the profile "spread like wildfire" through the high school student body. *Id.*

In reaching its decision, the majority in *Layshock* repeatedly emphasized that because the school district had not challenged on appeal the district court's finding that the district could not "establish[ ] a sufficient nexus between Justin's speech and a substantial disruption of the school environment," the Circuit court did not consider the argument that the school district could "properly punish Justin under the *Tinker* exception for student speech that causes a material and substantial disruption of the school environment." *Id.* at 214 (internal citations omitted). Instead, the school district had argued that its punishment was appropriate on the grounds that a "sufficient nexus exist[ed] between Justin's creation and distribution

of the vulgar and defamatory profile of Principal Trosch and the School District" to allow the district to punish the speech, insofar as Justin created the profile using a photograph of the principal from the school district's website. *Id.* (citing to school district's brief). The school district's argument was grounded on another Supreme Court precedent, *Bethel School District No. 403 v. Fraser*, in which the Court "upheld the school's suspension of a high school student for delivering a nominating speech at a school assembly using 'an elaborate, graphic, and explicit sexual metaphor.'" *Layshock*, 650 F.3d at 211 (citing *Fraser*, 478 U.S. at 678). *Fraser* is one of the few narrow exceptions to *Tinker*, in that this precedent additionally allows schools to regulate student speech *in school* that is "lewd," "vulgar," "indecent," and "plainly offensive." *Snyder*, 650 F.3d at 927 (emphasis in original) (quoting *Fraser*, 478 U.S. at 683, 685).

In reviewing the case law the school district provided in support of its argument that it could regulate a student's crude and vulgar speech posted on the internet, the majority in *Layshock* distinguished those cases on the ground that "each of those cases involved off-campus expressive conduct that resulted in a substantial disruption of the school, and the courts allowed the schools to respond to the substantial disruption" caused by that off-campus speech. *Id.* at 217.

The majority in *Layshock* ultimately held that the student's use of the school district's website did not amount to "entering" the school, and that the school

district's punishment violated the student's First Amendment free speech rights on the specific facts of the case. *Id.* at 219. However, the majority emphasized that it "need not now define the precise parameters of when the arm of authority can reach beyond the schoolhouse gate because, as we noted earlier, the district court found that Justin's conduct did not disrupt the school, and the District does not appeal that finding." *Id.*

Our in-depth discussion of *Snyder* and *Layshock* is meant to show the level of discord in the Third Circuit over whether and how to apply *Tinker* to various student speech scenarios, especially those involving the Internet. We further note that this is not unique to our Circuit, and that lower courts across the country are divided on this question of whether and how *Tinker*'s substantial-disruption test applies to off-campus student speech. *Snyder*, 650 F.3d at 937 (Smith, J., concurring) (collecting cases).[3] With this somewhat unsettled area as the backdrop, a district court in this Circuit takes up a student off-campus speech case for review with considerable apprehension and anxiety.[4]

---

[3] The majority in *Snyder* clarified that it did not perceive there to be a circuit split; they instead emphasized that the inquiry under *Tinker* is highly fact specific, and thus that each case is decided based on its own facts. 650 F.3d at 931 n.8.

[4] We note that the most recent significant student speech case decided by the Third Circuit, *B.H. ex rel. Hawk v. Easton Area School Dist.*, 725 F.3d 293 (3d Cir. 2013), *cert. denied*, 134 S.Ct. 1515 (2014), did not involve off-campus speech.

### 2.      Application of Precedent to R.L.'s Speech

Plaintiffs make two arguments as to why R.L.'s punishment was impermissible under *Tinker*. First, they argue based on *Layshock* and *Snyder* that the Supreme Court and the Third Circuit have never allowed schools to punish students for off-campus speech that did not actually cause a substantial disruption at school. Second, and relatedly, Plaintiffs argue that Defendants violated R.L.'s First Amendment free speech rights because, based on the facts in the record, no substantial disruption in fact occurred at the High School that can be traced to R.L.'s Facebook post.

As to Plaintiffs' first argument, they mischaracterize the import of the aforementioned precedent. First, as a matter of logical reasoning, just because the Third Circuit has never approved a school district's punishment of a student for off-campus speech that did not cause actual disruption does not mean that punishment under such facts would never be appropriate. The Third Circuit may not have yet reviewed a case in which they found punishment under those circumstances permissible, but the circuit court of course makes its decisions based on the specific facts of each case before it. And as Supreme Court and Third Circuit precedent makes abundantly clear, decisions in student speech cases are highly fact specific.

Additionally, regardless of whether we decide an actual substantial disruption occurred in this case, federal precedent, from *Tinker* to *Snyder*, consistently frames the rule as allowing for punishment where school administrators could reasonably forecast a substantial disruption at school based on the student speech. For example, we again reference the specific holding of the Third Circuit in *Snyder*: "Because J.S. was suspended from school for speech that indisputably caused no substantial disruption in school *and that could not reasonably have led school officials to forecast substantial disruption in school*, the School District's actions violated J.S.'s First Amendment free speech rights." *Id.* at 920 (emphasis added). It would be at best a major revision of *Tinker*, and at worst reversible error under *Tinker*, for a court to decide that student speech that school administrators reasonably predicted would cause substantial disruption, but happened to technically occur off-campus, was not able to be disciplined by administrators. The main quandary of federal courts is whether *Tinker* applies to student speech that occurs off-campus at all—there is no question that the law permits school discipline based on a reasonable forecast of substantial disruption.

Admittedly, this case would be simpler if the Third Circuit had decided in *Snyder* or *Layshock* that *Tinker* applies to off-campus speech. However, this Court is still comfortable deciding that *Tinker* applies to the instant matter. First, we note that even if *Snyder* did not formally decide that *Tinker* applied in that case, it is still

significant that the majority opinion assumed *Tinker* applied and analyzed the case under *Tinker*'s standard. Further, as we shall elaborate upon below, R.L.'s speech presents a factual situation that shows the logic of applying *Tinker* to off-campus speech in certain limited scenarios.

Putting aside the off-campus issue for a moment, we find that based on the undisputed facts in the record, it was reasonable for Defendants to forecast substantial disruption at the High School due to R.L.'s Facebook post.[5] "*Tinker* requires a specific and significant fear of disruption, not just some remote apprehension of disturbance." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 211 (3d Cir. 2001). Here, the prospect of disturbance based on R.L.'s speech was far from remote—the High School had already been evacuated and put on high alert based on an earlier undisputed bomb threat that very same day. Approximately twenty (20) police officers had responded to the morning bomb threat. A canine unit had been dispatched to search the school for a bomb. Students had been dismissed early. The High School's gas lines had even been disconnected as a precaution. In other words, the school had already been disrupted by a bomb

---

[5]  No party at this stage argues that it is inappropriate for this Court to make a determination as to the reasonableness of a forecast of substantial disruption based on R.L.'s speech. We further note that most, if not all, of the student speech cases cited by the parties did not go to trial, and were instead resolved at an earlier stage, such as summary judgment. *See Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist.*, 494 F.3d 34, 40 (2d Cir. 2007) ("Whether these aspects of reasonable foreseeability are considered issues of law or issues of fact as to which, on this record, no reasonable jury could disagree, foreseeability of both communication to school authorities, including the teacher, and the risk of substantial disruption is not only reasonable, but clear.").

threat on the same day R.L. posted on Facebook that the ". . . bomb isn't found and goes off tomorrow."  "[I]f a school can point to a well-founded expectation of disruption—especially one based on past incidents arising out of similar speech— the restriction may pass constitutional muster." *B.H. ex rel. Hawk*, 725 F.3d at 321 (quoting *Saxe*, 240 F.3d at 212). In the instant matter, the "past incident" of "similar speech" was the bomb threat earlier *that same day*, which indisputably caused substantial disruption to the school.  Moreover, unlike the anti-war armbands in *Tinker* or crude MySpace profiles in *Snyder* and *Layshock*, school administrators clearly viewed R.L.'s post as an issue of school safety. After all, at the time of R.L.'s post, no bomb had yet been found—it was not yet totally clear whether it was safe to reopen the school. It is surely beyond peradventure that student speech such as R.L.'s, which at best causes a real concern for student safety and at worst could be viewed as a threat to safety, is more likely to cause disruption than speech which is political or merely offensive to polite society. In light of the many school shootings that have tragically occurred over the past few decades, there can be no doubt that schools, parents, and students must take any suggestion of a bomb threat very seriously and with great cause for concern.

Additionally, Plaintiffs' contention that R.L.'s post was only meant to be a joke, as apparently signified by the "Plot twist" preamble, is ultimately beside the point. First, what matters under *Tinker* is the reasonableness of the school

administrators' forecast of disruption—not the student's subjective intent behind the speech. It is clear and undisputed that Superintendent Snell viewed R.L.'s post as similar to the morning bomb threat and warranted a similar response; his testimony showed no indication he viewed the Facebook post as a joke. He and other administrators considered bringing the canine unit back to the school, and law enforcement in fact recommended they bring the canine unit back. (Snell Dep., p. 42).[6] Superintendent Snell also took R.L.'s speech so seriously that he traveled to the away football game to personally question R.L. about the post, including questioning him about his ability to make a bomb. Conversely, Plaintiffs have offered no testimony that other students or administrators who viewed the post found it to be nothing more than a funny joke or commentary.[7] Most importantly, under *Tinker*'s standard, it is not necessary for us to decide that it was proper for Defendants to characterize R.L.'s speech as a threat in itself. The correct inquiry is related but materially different. Again, the inquiry under *Tinker*'s standard is whether the speech in question could reasonably be predicted to cause substantial disruption at school. In other words, it could be, and was in fact, reasonable for Defendants to predict R.L.'s speech could cause a substantial disruption at school

---

[6] For a variety of logistical reasons, the canine unit was not ultimately brought back to the school.

[7] Plaintiffs submit evidence that R.L. and his friends use the phrase "plot twist" when making jokes, but they have not offered evidence that anyone besides R.L. knew his Facebook post in question was a joke.

without believing his speech was intended as an actual threat, based on the aforementioned fear and chaos caused by the bomb threat earlier that same day.

To the extent relevant, Defendants have submitted evidence that the High School experienced actual substantial disruption as a result of R.L.'s Facebook post. For example, Defendants cite to the time and effort spent by at least seven school administrators and the police in response to R.L.'s post. (Doc. 50, p. 22). They also cite to school administrators' testimony that multiple students came to them concerned about the post, and that parents called them expressing concern and wanting to know what was being done to assure school safety. Plaintiffs object to much of this evidence on the grounds that it was unclear based on the testimony whether the students and parents were specifically concerned about R.L.'s post or whether their concern related to the morning bomb threat. Plaintiffs also object on the grounds that much of this testimony is inadmissible hearsay to the extent it is offered to show parent or student concern about the post. We note that Defendants make no counterargument with regard to the multitude of hearsay objections lodged by Plaintiffs. Regardless, because we find that it was reasonable for school administrators to forecast that R.L.'s post would cause a substantial disruption at the school, based on the substantial disruptions that had already occurred that day due to a bomb threat, on the fact that that the bomb that had been threatened had still not been found, and on the fact that administrators viewed this as a pending

safety situation, we need not determine whether R.L.'s speech caused an actual

substantial disruption in and of itself in order to find the Defendants' actions

justified under *Tinker*.

Our finding that it was reasonable for Defendants to forecast disruption is in

line with cases in other circuits that have reviewed off-campus student speech

under *Tinker*. In *Wisniewski v. Board of Education of Weedsport Central School

District*, the Second Circuit considered a First Amendment challenge to a student's

suspension for sharing with friends—over the Internet—a drawing "crudely, but

clearly, suggesting that a named teacher should be shot and killed." 494 F.3d 34,

35 (2nd Cir. 2007). There, the panel found in favor of the school district, on the

grounds that under *Tinker*, it was "reasonably foreseeable that [the student's]

communication would cause a disruption within the school environment." *Id.* The

court additionally found that the fact the student's speech occurred off-campus

"d[id] not necessarily insulate him from school discipline" and that the court had

previously recognized that "off campus conduct can create a foreseeable risk of

substantial disruption within a school . . . ." *Id.* at 39. The panel did note that it was

"divided as to whether it must be shown that it was reasonably foreseeable that [the

student's Internet speech] would reach the school property or whether the

undisputed fact that it did reach the school pretermits any inquiry as to this aspect

of reasonable foreseeability." Regardless, the panel emphasized that it did agree

that based on the undisputed facts, "it was reasonably foreseeable that the [student's speech] would come to the attention of school authorities . . . ." *Id.*

Moreover, in *Wisniewski*, a police investigator and a psychologist reviewing the student's case concluded that the speech was intended to be a joke, and that the student posed no real threat to any school official. *Id.* at 36. However, the court found the student's intent irrelevant to their inquiry—it concluded that the foreseeability of the speech's communication to school administrators and the clear risk of substantial disruption permitted the school to discipline the student, regardless of the student's intent. *Id.* at 40.

Similarly, in *Doninger v. Niehoff*, another student off-campus speech case in which the Second Circuit affirmed the district court's conclusion that the record did not show that the student's First Amendment free speech rights had been violated when the student was punished for Internet speech,[8] the court found that a school district could meet its burden to show why punishment of speech was justified under *Tinker* by showing a foreseeable risk of substantial disruption, and that a showing of actual disruption was not required. 527 F.3d 41, 51(2nd Cir. 2008).

---

[8] As a point of clarification, in *Doninger*, the Second Circuit affirmed the district court's denial of the student's parent's motion for a preliminary injunction, which the district court had denied on the grounds that the student had not shown a substantial likelihood of success on her claim that the school's actions violated her constitutional rights.

Additionally, the Ninth Circuit recently reviewed a student speech case that is also somewhat similar to the instant matter, in that the case concerned a student's off-campus speech about planning a school shooting. *Wynar v. Douglas Cty. Sch. Dist.*, 728 F.3d 1062 (9th 2013). Unlike R.L., the student in *Wynar* wrote multiple internet instant messages to friends from school that were much more directly threatening in that the student communicated that he personally was planning to shoot people at the school, and discussed specific people and groups of people he planned to shoot. *Id.* at 1065-1066. Regardless, this was off-campus speech, but the court applied the *Tinker* framework of analysis and ultimately held that the student's First Amendment rights were not violated because his messages, "which threatened the safety of the school and its students, both interfered with the rights of other students and made it reasonable for school officials to forecast a substantial disruption of school activities." *Id.* at 1067. The court concluded that it "it is an understatement that the specter of a school shooting qualifies under either prong of *Tinker*." *Id.* at 1070.

In another similarity to the instant matter, the court in *Wynar* considered the student's contention that he was only joking about a shooting:

> We need not discredit [the student's] insistence that he was joking; our point is that it was reasonable for [the school district] to proceed as though he was not. Faced with this scenario, the school district officials reasonably could have predicted that they would have to spend 'considerable time dealing with [parents' and students'] concerns and ensuring that appropriate safety measures were in place.'

27

*Id.* at 1071 (quoting *D.J.M. v Hannibal Pub. Sch. Dist. No. 60*, 647 F.3d 754, 766 (8th Cir. 2011)).

In sum, based on the aforementioned persuasive precedent, it is clear that several circuits are comfortable applying *Tinker* to off-campus speech where school administrators could reasonably forecast substantial disruption at school, especially in cases where the speech could reasonably be viewed as threatening student or school safety. This further supports our decision to apply the *Tinker* standard to R.L.'s speech.

We also separately find, in case it is not already clear by our discussion up to this point, that it was highly foreseeable that R.L.'s speech would reach the school and school administrators, even though it technically occurred off-campus. Again, R.L.'s post raised the specter of a bomb going off at the school the next day. It is absurd to conclude that this speech would not reach the school administrators, and the police, as it in fact did. The medium is not the issue—it is the message that is problematic. Indeed, this type of off-campus speech highlights how off-campus speech could be even more disruptive to a school than on-campus speech. As opposed to the written bomb threat from earlier that morning, which appears to have been viewed by only the student who found the note and the school administrators to whom the student brought the note, R.L.'s Facebook post was instantaneously viewable to all of his Facebook "friends." At the time of the

posting, R.L. had approximately three hundred (300) Facebook "friends," (Doc. 52, ¶ 77), many of whom were presumably other students at the High School. Further, there is no reasonable doubt the post was about the High School and not some other school. It was thus reasonably foreseeable that R.L.'s speech would come to the attention of school authorities, even if it happened to occur on the Internet versus on a slip of paper at the school. We note that in *Snyder*, the court highlighted the fact that the student had taken steps to make her MySpace profile private, showing, in the court's view, her intent for her speech to not reach the school. 650 F.3d at 930-31. Respectfully, at least with regard to the facts in the instant matter, we find this analysis overly formalistic and out of touch with the realities of cyberspace and social media. Further, as discussed earlier, we are disinclined to accord too much weight, if any, to a student's intent behind his or her speech.

Although many of the modern First Amendment school speech cases exemplify the complexity of threading the needle of a school's authority to maintain discipline and order and students' free speech rights, this case is ultimately more straightforward. Here, we have a school community that was already on edge after an undisputed bomb threat. Later that day, a student writes a Facebook post that the police and school administrators reasonably thought might also be a continuation of the same bomb threat, or at the very least that it would

lead to more disruption at the school. In response, the school questioned the student and ultimately suspended him. Superintendent Snell's testimony was clear that this was purely a matter of school safety. Again, this is not a case concerning political, crude, or offensive speech, as in the cases of *Tinker*, *Snyder*, and *Layshock*—it is a case involving speech that the Defendants interpreted as a possibly grave safety concern. In the wake of the shootings at Columbine, Sandy Hook, and Virginia Tech—to name only a few notorious school shootings— it would be reckless of this Court to force school districts in our jurisdiction to hesitate, or at worst, ignore suspicious speech that threatens harm like that of R.L. for fear of litigation over their response.

We also find that this case exemplifies why *Tinker* should be applicable to at least certain kinds of off-campus speech. If a school administrator reasonably views speech as a possible bomb threat to a school, or as speech that could cause fear that another bomb threat remains a concern to school safety, or that it will cause substantial disruption, the school administrator should be able to address that speech, regardless of whether it is transmitted over the telephone to the school, on a piece of paper at the school, or on a student's social media page.

Accordingly, we hold that under *Tinker*, Defendants did not violate R.L.'s First Amendment free speech rights when it disciplined him for publishing the

Facebook post in question, and therefore that Defendants are entitled to summary judgment on Plaintiffs' First Amendment claim. [9]

We additionally note that Defendants have argued R.L.'s punishment was permissible under the other prong of *Tinker*, as well, which permits schools to discipline students whose speech "intrudes upon . . . the rights of other students." *Tinker*, 393 U.S. at 504. This prong of *Tinker* has not been very developed by the Supreme Court or the circuit courts in terms of what type of speech would be considered to invade or interfere with the rights of others. As then- Circuit Judge Alito wrote in *Saxe*, "[t]he precise scope of *Tinker*'s 'interference with the rights of others' language is unclear . . . ." 240 F.3d at 217.  We know that speech that is "merely offensive" to a listener is not sufficient to meet this standard. *Id.* Defendants argue that R.L.'s speech invaded other students' "right to be secure." A right "to be secure and to be let alone" was indeed discussed in *Tinker*. 393 U.S. at 508. Viewing the undisputed facts in the record in the instant matter, we find Defendants' argument to be at least somewhat colorable. In *Wynar*, the circuit court concluded that "[i]t is an understatement that the specter of a school shooting qualifies under either prong of *Tinker*." 728 F.3d at 1070. Admittedly, the student

_____

[9] Plaintiffs broadly argue that any punishment of R.L. for his speech was inappropriate under the First Amendment, but they do not make a distinct challenge to the extent of the discipline; notably, they do not separately challenge the additional expulsion for 13 days to follow R.L.'s initial 10 day suspension. (Doc. 1, 32). Accordingly, we need not decide whether the extent of the discipline was unconstitutional in some way. *See Wisniewski*, 494 F.3d at 40 ("However, in the absence of a properly presented challenge, we do not decide whether the length of the one semester suspension exceeded whatever constitutional limitation might exist.")

speech in *Wynar* could be viewed as much more directly threatening, but the

undisputed evidence in the matter *sub judice* is that the school administrators

viewed R.L.'s speech as a possible threat to student safety, or alternatively stated, a

threat to the students' "right to be secure." Regardless, because this prong of

*Tinker* has been so little developed, we shall not rest our decision on it.[10]

### C.   Whether the School District's Punishment Violated Pennsylvania Law

Plaintiffs additionally argue that based on their reading of the statutory text

of Pennsylvania's Administrative Code, students' free speech rights under state

law may be even broader than they are under federal law. Specifically, Plaintiffs

argue that under state law, "student speech must *actually* materially and

substantially interfere with the educational process in order for it to be prohibited."

(Doc. 55, Pl.'s Br., p. 19) (emphasis in original). In other words, Plaintiffs assert

that Pennsylvania school districts cannot restrict speech that they reasonably

predict will cause a substantial disruption, as they can under *Tinker*, according to

Pennsylvania law—in Plaintiffs' view, schools can only restrict speech that has

already caused disruption.

---

[10] Defendants have also argued that R.L.'s punishment was permissible because his speech amounted to a "true threat" and was thus unprotected by the First Amendment. However, given that we have already decided that the school district's punishment was justified under *Tinker*, we need not decide whether R.L.'s post rose to that level. *See Wynar*, 728 F.3d at 1070 n.7 (declining to decide whether the student's speech was a true threat on the same grounds).

The relevant section of the Administrative Code reads: "Students shall have the right to express themselves unless the expression materially and substantially interferes with the educational process, threatens serious harm to the school or community, encourages unlawful activity or interferes with another individual's rights." 22 Pa. Code § 12.9(b).

Plaintiffs' argument on this point is entirely based on its reading of the excerpted text of the Administrative Code—they cite to no case law in support of their reading. This is because there does not appear to be any case law addressing this question.[11]

Defendants counter Plaintiffs' reading of the statute by citing multiple recent student speech cases in which Pennsylvania school districts were involved. These cases were analyzed by the Third Circuit under *Tinker*'s substantial disruption or reasonable forecast of disruption standard, and did not discuss or apply a Pennsylvania "actual disruption" standard.[12] While Defendants are correct that the cases do not apply a different state law standard to analyze a Pennsylvania student's free speech claims, they in fact only involved—at least on appeal—the students' free speech claims under the First Amendment. Thus, it does not appear

---

[11] The initial panel decision in *Snyder* mentioned this Code section briefly in analyzing whether the school handbook at issue was overbroad on its face, but it did not analyze or discuss the meaning of the regulation at all. *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 593 F.3d 286, 306 (3d Cir. 2010), *vacated on other grounds*, 650 F.3d 915 (2011).
[12] Defendants cite to *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 107 (3d Cir. 2013), *Snyder*, and *Hawk*.

that this question of state law was addressed in any of these cases, although one could reasonably argue that the students in those cases would have pursued a claim under § 12.9(b) if they believed their speech had broader protection under state law.

Again, this Court is being asked in the instant case to navigate uncharted waters—this time, an issue of state law. Part of the wisdom of *Tinker* is its explicit forward-looking orientation. As discussed earlier, *Tinker* respects that school administrators must be able to decide on the front end, if possible, whether speech could lead to material and substantial disruption, rather than wait until their schools descend into chaos to regulate the offending speech. We admit that § 12.9(b) of the Code is less explicitly pellucid on the issue of whether it permits prophylactic regulation of speech. However, it is clear that this Code section is at least partially modeled on the *Tinker* standard. Both *Tinker* and this state law discuss material and substantial interference with the educational process. Admittedly, the Code does not additionally include *Tinker*'s further application of their "material and substantial interference" test insofar as the Supreme Court, applying their test to the facts of that case, found that the record before them "did not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities . . . ." However, if the drafters of the Code intended to so significantly diverge from the teachings of

*Tinker*, of which we must assume they were clearly aware, to a degree that they did not wish for school administrators to be able to act on a student's offending speech prior to the whole school being disrupted, we believe the drafters would have indicated this rather illogical desire by explicitly addressing this expansion of speech rights beyond *Tinker* in the statute's text. They certainly, and logically, did not do so.

Thus, for the same reasons we outlined in our discussion of Plaintiffs' First Amendment claim, we find Plaintiffs' claim under state law to fail, as well.[13]

### D.    Plaintiffs' Constitutional Challenges to the School Handbook

R.L. was punished under Central York High School's Handbook policy which prohibits "Behavior or items brought to school that are inappropriate, that may cause a disruption to the school environment."  (Doc. 55, Ex. F, p. 30).

### 1.    Fourteenth Amendment- Vagueness and Notice Claims

Plaintiffs first argue that that this policy on its face only prohibits disruptive or inappropriate *on-campus* behavior, and thus to the extent the District uses the policy to punish off-campus behavior such as R.L.'s speech, it fails to provide adequate notice and therefore is unconstitutionally vague.

Whether a policy is unconstitutionally vague is based on the notice requirement of the Fourteenth Amendment's due process clause. *Snyder*, 650 F.3d

---

[13] We further note that R.L.'s speech is likely sanctionable under the other prongs of § 12.9(b), as well.

at 935 (citing *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999)). "A statute will be considered void for vagueness if it does not allow a person of ordinary intelligence to determine what conduct it prohibits, or if it authorizes arbitrary enforcement." *Id.* (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).

However, "[g]iven the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *Fraser*, 478 U.S. at 686. Based on this guidance from *Fraser*, the Third Circuit has stated the void for vagueness standard is "more relaxed" in the school environment. *Snyder*, 650 F.3d at 935. The Third Circuit has further "declared that school disciplinary rules should be struck down 'only when the vagueness is especially problematic . . .' " *Id.* at 936 (citing *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 266 (3d Cir. 2002)).

In *Snyder*, the student also challenged the school district's policies on vagueness and overbreadth grounds, based on the school district's application of the policies to punish her off-campus speech. The *Snyder* majority opinion concluded its discussion of the student's vagueness challenge as follows:

> As with the discussion of overbreadth above, [the student's] argument seems to rely on specific individuals' misinterpretations of the policies, and not the invalidity of the policies themselves. It was the extension and application of these policies to speech undertaken from her personal computer at her parents' home to which she objects here. This punishment, however, was not allowed by the vagueness of the

policies. Instead, it was implemented despite the fact that these policies quite clearly did not extend to the conduct at issue. As the policies are not unconstitutionally vague, much less vague in a matter that is 'especially problematic,' we will affirm the District Court's grant of summary judgment on this issue.

*Id.* at 936.

With regard to the vagueness issue, R.L.'s challenge to the Handbook policy under which he was punished is similarly problematic. As in *Snyder*, the crux of R.L.'s vagueness argument is not that the policy itself is vague, but that school administrators incorrectly interpreted and applied this policy to punish his off-campus behavior.

We find that the policy's text is adequately clear that it concerns only inappropriate, on-campus behavior that could have a disruptive impact at school. The policy specifically refers to "behavior or items *brought to school*" that are inappropriate and could cause disruption. While this policy could have been written more elegantly, the clear import of the policy is that the school district will punish student behavior occurring on-campus which is inappropriate to the extent it could cause disruption to the school environment. We note that if the policy ended with the first clause and thus only prohibited "inappropriate" behavior, the policy would almost certainly be unconstitutionally vague. However, the added requirement that the inappropriate behavior must also have the potential to be "disruptive" to the school environment brings the policy within constitutional

bounds, in that it provides an "imprecise but comprehensible normative standard" to students. *Sypniewski*, 307 F.3d at 266 (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)). Especially given the clear precedent that cautions against finding school policies void for vagueness, we align ourselves with the circuit court's decision in *Snyder* to the extent that the issue here is not vagueness of the policy itself but the administrators' inappropriate application of the specific policy to off-campus speech. Thus, we shall enter judgment in favor of Defendants on Plaintiffs' Fourteenth Amendment claim that this Handbook policy is unconstitutionally vague.

Plaintiffs additionally argue that Defendants violated R.L.'s due process rights by failing to provide adequate notice that his off-campus speech could be punished by the school. Apart from common sense notice, we find that the Handbook provided adequate notice to R.L. that his alarming statement bearing on school safety could be punished by the school, regardless of whether the post in itself is construed as a threat. *See Wynar*, 728 F.3d at 1074 (finding that the student was on notice he could be punished for his "alarming statements about shooting classmates" and that he also had adequate notice that he could be punished for certain off campus behaviors). Under "Student Responsibilities," the Handbook states that students have a "responsibility to develop a climate within the school that is conducive to wholesome learning and living," and that "[n]o student has the

right to interfere with the education of his or her fellow students." (Handbook, p.

28). We note that the latter provision contains no geographic limitations at all, and

that even though the first provision discusses a student's responsibility with regard

to the climate "within the school," R.L. had adequate notice based on both

provisions that making a statement that a bomb could go off the next day at the

school could negatively affect the school climate and interfere with students'

ability to focus on learning without the fear and anxiety that a bomb could go off at

any moment. Moreover, we again highlight the Supreme Court's statement in

*Fraser* that "[g]iven the school's need to be able to impose disciplinary sanctions

for a wide range of unanticipated conduct disruptive to the educational process, the

school disciplinary rules need not be as detailed as a criminal code which imposes

criminal sanctions." 478 U.S. at 686.

In *Brian A. ex rel. Arthur A. v. Stroudsburg Area School District*, another

court in our district reviewing a case with similar facts came to the same

conclusion that the school's handbook provided adequate notice. 141 F.Supp.2d

502, 511 (M.D. Pa. 2001). There, the student wrote a note in art class that stated

that there was a bomb in the school. As a side note, the student also contended the

note was a joke. *Id.* at 505. There, as here, there was no specific handbook policy

prohibiting bomb threats, or statements that could be construed as a warning that

there could be a bomb in the school. The court found the student's Fourteenth

Amendment claim that he had inadequate notice his conduct was prohibited "frivolous on its face." *Id.* at 511. The court went on to cite more broadly written behavior guidelines in the student handbook that were appropriately read to apply to the student's threat, such as the handbook's requirement that students must: "Conform to reasonable standards of socially acceptable behavior. Respect the rights, person and property of others. Preserve the degree of order necessary to the educational program in which they are engaged." *Id.*

Thus, even if we assume that the specific Handbook policy under which R.L. was punished did not provide adequate notice that he could be punished for off-campus speech, other provisions of the Handbook did provide adequate notice. Accordingly, we shall also enter judgment in favor of Defendants on Plaintiffs' Fourteenth Amendment claim that he had insufficient notice that his behavior was prohibited.

## 2.   Overbreadth

Next, Plaintiffs argue that if, despite its "plain language," the Handbook policy is intended to apply equally to on and off-campus behavior, it is unconstitutionally overbroad.

"A regulation is unconstitutional on its face on overbreadth grounds where there is [ ] 'a likelihood that the statute's very existence will inhibit free expression' by 'inhibiting the speech of third parties who are not before the

Court.'" *Saxe*, 240 F.3d at 214 (quoting *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 799 (1984)). In order for a law or regulation to be unconstitutionally overbroad, the overbreadth must be "substantial in relation to the statute's plainly legitimate sweep." *Id.* (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)). As with finding a law void for vagueness, courts should hesitate before finding a law overbroad on its face. Prior to making such a determination, a court should "first determine that the regulation is not 'susceptible to a reasonable limiting construction.'" *Snyder*, 650 F.3d at 934 (quoting *Saxe*, 240 F.3d at 215).

"[A] school disciplinary policy will be struck down as overbroad only after consideration of the special needs of school discipline has been brought to bear together with the law's general hesitation to apply this 'strong medicine.'" *Snyder*, 650 F.3d at 935 (internal citations omitted). The Third Circuit has cautioned courts to be especially "hesitant" in their application of the overbreadth doctrine in the public school setting. *Id.*

As alluded to earlier in our discussion of vagueness, in *Snyder*, the court rejected the student's overbreadth argument on "factual grounds," "as the policies [were] explicitly limited to in-school speech." 650 F.3d at 935. As in *Snyder*, the Handbook policy here is limited by its text to on-campus, inappropriate behavior that may cause a disruption. In that regard, R.L.'s overbreadth argument fails on

"factual grounds," as well, to the extent he challenges the policy on its face for

application to off-campus behavior. Admittedly, this policy was utilized by the

District when it decided to punish R.L. for his off-campus speech; however, as the

court reasoned in *Snyder*, "misinterpretation of [a policy] by specific individuals . .

. does not make the [policy] overbroad." *Id.* Accordingly, we are compelled to

conclude that although it was inappropriate for the school administrators to use this

specific policy to punish R.L. for his off-campus behavior, because it is by its

terms limited to on-campus behavior, the policy itself is not unconstitutionally

vague or overbroad in this regard, based on the reasoning in *Snyder*.

However, we do agree with Plaintiffs' argument that the Handbook policy is

facially overbroad to the extent it regulates substantially more "disruptive"

behavior or speech beyond what is permissible under *Tinker*. As an initial matter,

we do not believe, nor have Defendants argued, that this very concise,

straightforward policy is susceptible to a limiting construction.

Under *Tinker*, student speech can be regulated only if it causes, or if it is

*reasonably foreseeable* to cause, *substantial* disruption or material interference

with school acitivities.[14] As our exegesis of precedent makes clear, courts are very

hesitant to find that a student's speech has caused, or will foreseeably cause,

---

[14] Of course, as aforementioned, *Tinker* also permits student speech to be regulated if it interferes
with the rights of others, or if it falls into the one of the few narrow exceptions not relevant here,
such as speech promoting illegal drug use.

substantial disruption. In other words, there appears to be a high threshold for speech to qualify as causing substantial disruption, although precedent has not yet specifically defined what that threshold is. However, under this Handbook policy, speech that causes very minor disruptions or disturbances at school —for example, speech that causes one teacher to have to start class a few minutes late—could be prohibited or provide grounds for student discipline. Moreover, "inappropriate" speech that merely "may" cause a disruption can be prohibited. Of course, not every minor disruption by a student will be punished under this policy; thus, there is also an issue of unfair application and standardless discretion to punish particular forms of slightly or moderately disruptive speech. Accordingly, we find this policy substantially overbroad.

We believe our holding is in line with the circuit court's overbreadth decision in *Saxe*, as well. There, the court examined a school district's anti-harassment policy. Even reading the policy narrowly, the court found that it prohibited a significant amount of non-vulgar, non-sponsored student speech. *Id.* at 216. Thus, the court concluded that the school district must satisfy the *Tinker* standard by "showing that the Policy's restrictions are necessary to prevent substantial disruption or interference with the work of the school or the rights of other students." *Id.* Ultimately, the court held the policy was unconstitutionally overbroad, in part because the policy punished "not only speech that actually

causes disruption, but also speech that merely intends to do so . . . this ignores *Tinker*'s requirement that a school must reasonably believe that speech will cause actual, material disruption before prohibiting it." *Id.* at 216-217.

In conclusion, we shall grant summary judgment in favor of Defendants on Plaintiffs' claim that the Handbook policy in question is void for vagueness and on Plaintiffs' Fourteenth Amendment inadequate notice claim, but we shall grant summary judgment in favor of Plaintiffs on their claim that the policy is overbroad to the extent it regulates more speech than is permissible under *Tinker*.

Additionally, as illustrated now by the overbreadth and vagueness challenges to the Handbook policy in the instant matter, we must observe that schools need clear guidance from the Third Circuit or the Supreme Court as to whether and when they can regulate off-campus speech. Once a clearer rule is pronounced, schools would be well advised to revise their disciplinary policies to clearly outline when off-campus student speech or conduct can be regulated by the school.

### E.    Qualified Immunity

Plaintiffs waived their opposition to Superintendent Snell's assertion of qualified immunity by their failure to argue the issue in their briefs regarding the instant motions. Regardless, we find Superintendent Snell entitled to qualified immunity.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In order to decide whether government officials are entitled to qualified immunity, the Supreme Court has established a two-part analysis for courts to undertake. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). First, a court must decide whether the facts as shown in the record[15] demonstrate that the government official's conduct violated a constitutional right. *Id.* Second, a court must decide whether the right at issue was "clearly established." *Id.* In order for a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).[16]

Given that we have found that Defendants' punishment of R.L. for his speech did not violate his First Amendment rights under the *Tinker* standard, Superintendent Snell has established qualified immunity. We further note that, as the briefs and our analysis make abundantly clear, the applicable First Amendment

---

[15] This is the version of the qualified immunity analysis undertaken at the summary judgment stage, as is the case in the instant matter.

[16] This sequence of analysis is no longer mandatory; courts may begin with deciding whether the right at issue is clearly established. *Pearson*, 555 U.S. at 236.

law in the instant case is a work in progress. How school administrators must balance students' First Amendment rights with their duty to protect and foster a safe learning environment is a tension of principles the circuit courts, as well as the Supreme Court, are actively negotiating and developing. Furthermore, the extent to which school administrators may discipline students for speech that may threaten school safety but which technically occurs off-campus, on the Internet, is a developing area of law. The Third Circuit has expressly refused to decide whether *Tinker* applies to off-campus speech. Thus, the law here is far from "clearly established."

Thus, we find that Superintendent Snell is entitled to qualified immunity in the instant matter.

## IV.   CONCLUSION

It is clear that there is a disagreement within the Third Circuit Court of Appeals as to whether to apply *Tinker* to off-campus speech by students, and with good reason. Free speech is a sacrosanct constitutional right in this country, and it is a right at least conditionally guaranteed to students, as well. The case at bar provides an example of the type of off-campus speech a school should be able to regulate, while at the same time underscoring the limits of *Tinker*'s application to other kinds of off-campus speech. Logically, schools should be able to discipline students on account of off-campus speech they reasonably believe could cause

disruption in the form of danger or violence, or fear of danger or violence, in schools. Such a rule would also account for the modern reality of the Internet and social media networks on which students actively engage, whether they are on-campus or off-campus. Indeed, a bright line distinction between on-campus and off-campus speech in the context of Internet speech is both anachronistic and illogical. This rule also acknowledges and respects the dangerous aura of school violence that is never far from the minds of administrators, teachers, and students.

While we respect deeply that R.L.'s parents feel the need to vindicate him, we fundamentally disagree with their conclusion that his punishment is violative of the First Amendment. We decline the Lordans' invitation to extend the law to what we believe is an untenable extreme. The school administrators involved in this case, if they erred at all, did so in the interest of safety and caution. Their apprehensions about potential disruption were manifestly logical. We will not deprive them of the ability to mete out appropriate sanctions via a nonsensical interpretation of precedent that tortures both law and logic.

For all the above reasons, we shall grant in part and deny in part Plaintiffs' motion for summary judgment. We shall grant Plaintiffs' motion only to the extent that we find in favor of Plaintiffs on Count I, solely with regard to the overbreadth claim contained therein, as detailed above. On all other claims, we shall grant summary judgment in favor of Defendants.

A separate Order in accordance with this Memorandum shall follow.